# IN THE UNITED STATES DISTRICT COURT

# FOR THE NORTHERN DISTRICT OF CALIFORNIA

# SAN JOSE DIVISION

| | |
|---|---|
| IN RE WACHOVIA CORPORATION "PICK-A-PAYMENT" MORTGAGE MARKETING AND SALES PRACTICES LITIGATION. | Case No. 5:09-md-02015-JF<br><br>ORDER (1) GRANTING FINAL APPROVAL OF CLASS ACTION SETTLEMENT; (2) ADDRESSING OBJECTIONS; (3) DENYING MARCELLA ROSE'S MOTION TO INTERVENE; (4) APPROVING SERVICE PAYMENTS TO CLASS REPRESENTATIVES; AND (5) AWARDING ATTORNEYS' FEES AND COSTS |

On April 29, 2011, the Court conducted a hearing with respect to the following motions and objections: (1) motion of named Plaintiffs and Defendants for final approval of class action settlement; (2) objections of Michael Hargett, Marcella Rose, and others; (3) Marcella Rose's motion to intervene; (4) request for service payments to class representatives; and (5) motion of class counsel for an award of attorneys' fees and costs. The Court has considered the documents filed in connection with these motions and objections as well as the oral argument presented at

Case No. 5:09-md-02015-JF
ORDER (1) GRANTING FINAL APPROVAL OF CLASS ACTION SETTLEMENT ETC.
(JFLC2)

the hearing. The Court finds and concludes as follows:

## I. FINAL APPROVAL OF CLASS ACTION SETTLEMENT

This multi-district litigation concerns Defendants' "Pick-a-Payment" mortgage loans, which permitted borrowers to select and make a minimum payment amount for a limited time and subject to certain conditions. Borrowers could choose to make: (1) a fully-amortizing 30-year interest and principal payment such that the loan would be satisfied in the traditional 30-year term; (2) a fully-amortizing 15-year interest and principal payment such that the loan would be satisfied in a 15-year term; (3) an "interest-only payment"; or (4) a lesser, "minimum payment." When a payment was insufficient to pay the interest owed, unpaid interest was added to the loan balance and the outstanding loan balance increased. Plaintiffs allege that the loans violated the federal Truth-in-Lending Act ("TILA"), 15 U.S.C. § 1601 *et seq.*, and various state laws, because the relevant loan documents failed to make adequate disclosures regarding the certainty of negative amortization, the actual payment schedules, the interest rates on which these schedules were based, and the full terms of the parties' legal obligations.

In August 2007, Lead Plaintiffs' counsel filed a putative class action in this Court, *Mandrigues v. World Savings, Inc., et al.*, Case No. 5:07-cv-04497-JF. *Mandrigues* was litigated vigorously for several years, during which time the United States Judicial Panel on Multidistrict Litigation transferred to the undersigned for coordinated pretrial proceedings numerous other "Pick-a-Payment" class actions and single-plaintiff actions. After extensive motion practice and the completion of briefing with respect to Plaintiffs' motion for class certification and the parties' cross-motions for summary judgment, the parties reached settlement with the assistance of Judge John K. Trotter (Ret.). On December 16, 2010, following a hearing, the Court granted preliminary approval of the settlement, certified three classes for settlement purposes, and appointed class representatives and class counsel.

The settlement classes comprise individuals who entered into "Pick-a-Payment" loans with Defendants between August 1, 2003 and December 31, 2008. Settlement Class A consists

of borrowers who no longer hold their "Pick-A-Payment" loans[1]; Settlement Class B consists of borrowers who still hold their loans and are not in default; and Settlement Class C consists of borrowers who still hold their loans and are in default. Under the terms of the settlement, Defendants will pay $50 million to the class. The entire amount of the settlement fund, less service payments to class representatives in a maximum total amount of $125,000 (discussed below), will be distributed on a *pro rata* basis to Settlement Class A members who have submitted timely, valid claim forms and to Settlement Class B and C members who have not excluded themselves from the settlement. Because the settlement fund will be divided on a *pro rata* basis, no unclaimed portion of the fund will remain after distribution. In the event that a class member fails to cash his or her check within ninety days after issuance despite a required reminder notice from the settlement administrator, the funds from uncashed checks will be used to offset administration and notice expenses; any remaining funds will be distributed by means of a *cy pres* fund to non-profit organizations.

In addition to paying $50 million to the class, Defendants will implement a loan modification program available to qualified Settlement Class C members and to qualified Settlement Class B members who are in "imminent default." Eligible class members first will be considered for the federal Home Affordable Modification Program ("HAMP"). If the class member does not qualify under HAMP or elects not to accept a HAMP modification, the member will be considered for Defendants' new loan modification program, Mortgage Assistance Program 2 ("MAP2R"). The goal of the MAP2R program is to reduce a class member's "DTI"[2] to thirty-one percent or less. In order to accomplish this, Defendants will apply a series of steps such as waiver of accrued interest and other charges, forgiveness of principal, and reduction in interest rate. Once a DTI of thirty-one percent is reached, the loan will be converted into a fully-

---

[1] Settlement Class A includes borrowers who paid off their loans by selling their homes, by refinancing, or by other means. Borrowers who lost their homes as a result of foreclosure are excluded from the class.

[2] "DTI" is the ratio of the class member's first-lien monthly mortgage obligations to his or her gross monthly income.

3

amortizing loan and the negative amortization feature will be eliminated. Class members who do not qualify for HAMP or MAP2R modifications will receive a written explanation of the reasons for denial. Class counsel will be copied on all such denials and will follow up with Defendants to ensure that the loan modification program is functioning as intended. This Court will retain continuing jurisdiction to interpret and enforce the settlement agreement. Plaintiffs' expert values the benefit to the class conferred by the loan modification program in the range of $839 million to $2.7 billion. The loan modification program will remain in place through June 2013.

Eligible Settlement Class B and C members who are unable to qualify for modifications under HAMP or MAP2R guidelines but who qualify for short-sale or deed-in-lieu of foreclosure under the Home Affordable Foreclosure Alternatives ("HAFA") guidelines will be offered incentive payments of at least $1,500 for a short-sale or deed-in-lieu of foreclosure. Additionally, Defendants will pay $1 million for class notices and claims administration costs, and up to $25 million in attorneys' fees and costs. These latter items – incentive payments, administration costs, and attorneys' fees and costs – will be paid separately by Defendants and will not diminish the $50 million settlement fund.

The Court finds the settlement to be "fundamentally fair, adequate and reasonable" as is required under Federal Rule of Civil Procedure 23(e) and applicable Ninth Circuit authority. *See Mego Financial Corp. Sec.* Litig., 213 F.3d 454, 458 (9th Cir. 2000); *Officers for Justice v. Civil Service Commission*, 688 F.2d 615, 625 (9th Cir. 1982). "Assessing a settlement proposal requires a district court to balance a number of factors: the strength of the plaintiffs' case; the risk, expense, complexity, and likely duration of further litigation; the risk of maintaining a class action status throughout the trial; the amount offered in settlement; the extent of discovery completed and the stage of the proceedings; the experience and views of counsel; . . . and the reaction of the class members to the proposed settlement." *Mego Financial*, 213 F.3d at 458. The district court also must satisfy itself that the settlement is not the product of collusion among the negotiating parties. *Id*.

Although Plaintiffs' pleadings survived a number of motions to dismiss, given the evolution of case law regarding claims such as those at issue here, there is no guarantee that

Plaintiffs would have prevailed on summary judgment or at trial. This case is complex, both because of the conglomeration of multiple lawsuits from throughout the country and because of the large number of class members; trial likely would have been protracted. Defendants have offered a substantial amount of money in settlement, and the loan modification program provides significant benefits to the class, as described above. Extensive discovery has been completed – numerous depositions have been taken, and more than 15,000 pages of documents have been produced. Plaintiffs' counsel, who are experienced attorneys, believe that the settlement is extremely favorable to the class. Approximately 516,000 notices were delivered by direct mail to class members, but only a very small percentage objected or opted out, as is discussed more fully below. The settlement was reached after lengthy, arms-length negotiations overseen by Judge Trotter, a nationally known and respected mediator.

The Court also concludes that notice of settlement to the class was adequate and satisfied all requirements of Federal Rule of Civil Procedure 23(e) and due process. Class members received direct notice by United States mail, and additional notice was given by publication on the Internet and in *USA Today*. These were the best practicable means of informing class members of their rights and of the settlement's terms. *See Silber v. Mabon*, 18 F.3d 1449, 1453-54 (9th Cir. 1994) (affirming district court's conclusion that notice by direct mail and publication was best practicable notice).

The Court concludes that final certification of the settlement class is appropriate. The four prerequisites of Rule 23(a) are met: the proposed settlement class includes hundreds of thousands of borrowers (numerosity); all class members obtained similar "Pick-a-Payment" loans (commonality); the named class representatives entered into "Pick-a-Payment" loans, and their claims are reasonably coextensive with those of the class as a whole (typicality); and class counsel are experienced and qualified to conduct the litigation, and there is no evidence of collusion (adequacy). The class is adequately defined and clearly ascertainable – class members are individuals who obtained "Pick-a-Payment" mortgage loans from Defendants between August 1, 2003 and December 31, 2008. Finally, common questions of law or fact predominate, as all class members would have to demonstrate that the "Pick-a-Payment" mortgages violated

5

federal and/or state laws. *See* Fed. R. Civ. P. 23(b)(3).

Finally, the Court concludes that Plaintiffs' attorneys are experienced and able, and fairly and adequately have represented and will continue to represent the interests of the class. *See* Fed. R. Civ. P. 23(g). Accordingly, Plaintiffs' attorneys will be appointed as class counsel for purposes of certification of the settlement class.

## II. OBJECTIONS

As noted above, 516,000 notices were delivered by direct mail to class members, but only thirty-six timely objections to the settlement were received. This is an objection rate of .007%.[3] Only 456 class members – .08% – requested exclusion.[4] This positive response from the class weighs strongly in favor of approving the settlement, despite the dissatisfaction of some individuals. *See Churchill Village, LLC v. General Electric*, 361 F.3d 566, 577 (9th Cir. 2004) (affirming district court's approval of settlement where forty-five of 90,000 class members objected to the settlement, and 500 class members opted out). However, as the Court noted at the hearing, even one valid objection would be sufficient to show that the settlement is not in the best interests of the class. Accordingly, the objections will be addressed as follows.

### A. Difficulty Navigating the Loan Modification Program

A number of class members expressed concern about their ability to navigate the loan modification program. Some related their own negative experiences in detail. As it has expressed on the record a number of times, the Court is particularly concerned with ensuring that the loan modification program actually will work as outlined in the settlement agreement. In the months prior to the final approval hearing, the Court has referred a number of inquiries to class

---

[3] Five of the thirty-six objections were received from individuals who also opted out of the settlement. Class members who opt out lack standing to object to a settlement. *See In re Vitamins Antitrust Class Actions*, 215 F.3d 26, 28-29 (D.D.C. 2000). If these five objections are excluded, the objection rate is .006%.

[4] Seven additional class members made oral requests for exclusion at the hearing. Those requests were granted on the record. An eighth class member, Mr. Vega, made an oral request for exclusion, which was granted, but he subsequently submitted a note to chambers requesting that he be permitted to remain in the class. If the seven additional individuals are considered, then .09% of class members have been excluded from the settlement.

6

counsel, who have committed to ongoing involvement in the loan modification process. Class counsel represented that during the sixty days prior to the final approval hearing they assisted thirty to forty class members in obtaining loan modifications. Class counsel also stated on the record that they would be happy to speak with any class member about his or her loan modification efforts. Moreover, the Court expressly has retained jurisdiction over this matter. The Court concludes that these are the best safeguards that realistically could be expected in this type of settlement.

It should be noted that not every class member will be entitled to loan modification. Class counsel confirmed at the hearing that they have reviewed certain denials which were consistent with the terms of the settlement. To the extent that some individuals wish that class counsel had held out for a more favorable program, this type of "should have done better" objection routinely is rejected. *See, e.g., Linney v. Cellular Alaska Partn.*, 151 F.3d 1234, 1242 (9th Cir. 1998).

**B.      Whether the Loan Modification Program Confers a Benefit upon the Class**

Certain objectors contend that the loan modification program does not confer a benefit upon the class because California and other states have entered into Assurances with Defendants which provide for the identical relief. The Court notes that most of the loans at issue in this case were executed in California, and that California did not enter into an Assurance until after the motion for preliminary approval was filed. The MAP2R program thus was a significant benefit when it was negotiated. More importantly, the state attorney general settlements do *not* give individual borrowers a private right of enforcement. The instant settlement is binding and enforceable, and class members may assert their individual rights under the settlement agreement. Finally, only ten states have entered into Assurances with Defendants; the settlement agreement makes the loan modification program an option to class members in the other forty states.

**C.      Adequacy of Class Notice**

Other objectors assert that the class notice was inadequate because it did not disclose how much money each class member would receive under the settlement. It was impossible for the

7

notice to disclose precisely how much money each class member would receive, because although members of Class B and C will receive checks automatically, members of Class A must file claim forms in order to receive a distribution. Because class counsel could not predict how many claim forms would be submitted, they could not predict the amount that will be distributed to each class member.

**D.    Distribution of Funds Derived from Uncashed Checks**

Some objectors challenge the use of undistributed settlement funds to pay administration costs, claiming that this would result in a windfall to Defendants, who otherwise would have to pay administration costs out of pocket. Because the *entire* $50 million will be distributed to class members on a *pro rata* basis, the only funds at issue are funds from checks that class members fail to cash within ninety days. The administrator is obligated to send out reminder notices with respect to uncashed checks. Accordingly, the amount of money at issue is likely to be quite small. Class counsel assert, and the Court has no reason to doubt, that the cost of redistributing such funds to class members likely would exceed the amount of the funds themselves. Class counsel also point out that in large class actions the administration costs often come out of the funds set aside for distribution to the class. Because Defendants have agreed to pay administration costs of up to $1 million in this case, separate and apart from the $50 million set aside for distribution to the class, and given the likelihood that the amount of money in question is likely to be negligible, the Court concludes that there is nothing inherently unfair in permitting funds derived from unclaimed checks to be used for administrative expenses.

**E.    Argument That Class B  Members Should Receive More Benefits Than Class A and Class C Members**

One class member has expressed dissatisfaction with the fact that all class members are treated equally under the settlement agreement. In her view, an individual who made all her loan payments should be treated more favorably than an individual who defaulted on a loan. While the Court recognizes the frustration that must lie behind such an argument, the Court cannot agree that the settlement's equal treatment of all class members renders the settlement unfair.

### F. Mr. Hargett's Objection Regarding Potential Deficiency Judgments

Class member Michael Hargett, an attorney proceeding *pro se* in this matter, filed more than 200 pages of documents objecting to the settlement. He raises a number of the points discussed above, but his primary concern is the possibility that Defendants will pursue deficiency judgments against class members. However, Defendants' recent responses to requests for admission ("RFAs") propounded by Mr. Hargett alleviated this concern. Mr. Hargett read into the record Defendants' responses to a number of RFAs in which Defendants stated that as a general business practice they do not pursue deficiency judgments in connection with foreclosure proceedings involving Pick-a-Payment loans secured by the borrower's primary residence. Based upon those assurances, Mr. Hargett withdrew his objections.[5]

### G. Ms. Jones's Objections

Alberta Jones appeared telephonically at the hearing. She expressed generalized concerns regarding the settlement, and she requested leave to opt out of the class. Class counsel responded by noting that Ms. Jones is not a class member, as she obtained her Pick-a-Payment loan prior to the start of the class period. After the hearing, Ms. Jones filed documents suggesting that she believes that she should be a class member. Based upon the redacted copy of Ms. Jones's adjustable rate mortgage note that was submitted by Defendants, it is clear that Ms. Jones obtained her loan on May 23, 2003, which is outside the class period of August 1, 2003 through December 31, 2008. Because Ms. Jones is not a class member, she has no standing to raise objections, *see In re Vitamins Antitrust Class Actions*, 215 F.3d at 28-29, and her request to opt out is moot.

### H. Ms. Rose's Objection Re Nondisclosure Of NPV Formula

Marcella Rose, whose motion to intervene is addressed below, additionally filed an objection to the settlement based upon Defendants' failure to disclose their "net present value" or "NPV" formula. The NPV formula compares the expected economic outcome of the loan with

---

[5] At the hearing, class counsel acknowledged Mr. Hargett's contributions and requested leave to compensate him. The Court recognized that Mr. Hargett contributed a great deal to the final approval process and directed class counsel to submit an administrative motion regarding the compensation issue.

and without the proposed modification. The calculation depends in part upon the current value of the property securing the loan. The NPV formula has been disclosed to class counsel, who are satisfied. Defendants have offered to disclose the NPV formula to the Court *in camera*. The Court concludes that Defendants are not required to disclose their NPV formula to class members; the loan modification program is laid out in detail in the settlement agreement – Defendants need not disclose every aspect of their methodology in order to render the settlement fair and adequate.

### III. MOTION TO INTERVENE

Ms. Rose also has filed a motion to intervene. She presently is litigating a separate lawsuit, *Rose v. Wachovia*, in the Central District of California. That lawsuit asserts a number of claims that are unrelated to the failure disclose negative amortization at loan origination. Ms. Jones argues that her Central District complaint could be read broadly enough that there would be some overlap between that suit and this one. She also contends that she should be permitted to intervene in the instant action in order to represent individuals who were "forced" to sell their homes in order to pay off their loans.

In the Ninth Circuit, there are four requirements for intervention as of right under Federal Rule of Civil Procedure 24(a)(2): "(1) the application for intervention must be timely; (2) the applicant must have a 'significantly protectable' interest relating to the property or transaction that is the subject of the action; (3) the applicant must be so situated that disposition of the action may, as a practical matter, impair or impede the applicant's ability to protect that interest; and (4) the applicant's interest must be inadequately represented by the existing parties in the lawsuit." *Nw. Forest Res. Council v. Glickman*, 82 F.3d 825, 836 (9th Cir. 1996) (citation omitted). Alternatively, a court may grant permissive intervention under Rule 24(b) if there is an independent ground for jurisdiction, the motion to intervene is timely, and a common question of law or fact exists. *Southern Calif. Edison Co. v. Lynch*, 307 F.3d 794, 803 (9th Cir. 2002). Even if the threshold requirements for permissive intervention are met, a court has discretion to deny permissive intervention. *Id*.

These requirements are not satisfied here. The application for intervention is untimely.

10
Case No. 5:09-md-02015-JF
ORDER (1) GRANTING FINAL APPROVAL OF CLASS ACTION SETTLEMENT ETC.
(JFLC2)

As noted above, this action has been litigated vigorously for almost four years. The instant settlement is the product of months-long, arms-length negotiations. Ms. Rose's application, filed on the eve of the final approval hearing, simply is too late. The bulk of Ms. Rose's legal claims appear to be unrelated to the claims that are the subject of the instant action. To the extent that Ms. Rose is a Class A member, her interests are represented in this action. While she attempts to carve out a group of class members who have been "forced" to sell their homes in order to pay off their loans, the Court understands that borrowers who ended up with Pick-a-Payment loans often felt financial pressure to either sell their homes, or to refinance the loans. The Court is at a loss to discern a legally significant difference between those who chose to sell and those who chose to refinance.

If Ms. Rose believes that a better deal may be struck with Defendants, she is free to opt out and try her luck with her own lawsuit. At the hearing, the Court granted Ms. Rose's alternative request to opt out of this settlement.

### IV. SERVICE PAYMENTS TO CLASS REPRESENTATIVES

Courts often award service payments to class representatives in compensation for shouldering significant burdens during the litigation: retaining counsel, producing documents, responding to written discovery, and conferring with counsel. *See, e.g., Mego Financial*, 213 F.3d at 463 (9th Cir. 2000) (approving incentive awards of $5,000 to each of two class representatives in a settlement of $1.725 million). The Court concludes that the proposed incentive payments, ranging between $2,500 and $14,250 per named plaintiff and totaling $125,000, are appropriate.

### V. ATTORNEYS' FEES AND COSTS

"Under Ninth Circuit law, the district court has discretion in common fund cases to choose either the percentage-of-the-fund or the lodestar method." *Vizcaino v. Microsoft Corp.*, 290 F.3d 1043, 1047 (2002). The benchmark award is twenty-five percent of the recovery obtained, "with 20-30% as the usual range." *Id*. Although the twenty-five percent benchmark rate is a starting point for analysis, it may be inappropriate in some cases. *Id*. at 1048. "Selection of the benchmark or any other rate must be supported by findings that take into account all of the

circumstances of the case." *Id*. Relevant circumstances include the results achieved for the class, the risk to class counsel, benefits to the class other than the cash settlement fund, market rates for contingency fee retainers, and the burdens assumed by class counsel during the representation. *Id*. at 1048-50. The lodestar method may be used as a cross-check of the percentage method. *Id*. at 1050.

Class counsel request an award of $25 million. Defendants have agreed to pay attorneys' fees and expenses of up to $25 million separate and apart from the class fund of $50 million and administrative costs up to $1 million. If the Court were to consider only these cash components of the settlement, counsel request approximately one-third of the recovery. However, the loan modification component of the settlement confers a significant additional benefit on the class. Class counsel present the opinion of Yale Law Professor Jonathan Macy, who estimates that the value of the loan modification component is in excess of $800 million and possibly as high as $2.7 billion. If these figures are even remotely accurate, then $25 million is far less than the twenty-five percent benchmark commonly awarded in this circuit. A lodestar cross-check supports an award of $25 million. Counsel have documented hourly fees in excess of $11 million. Thus an award of $25 million would require application of a multiplier of 2.2, which is well within the acceptable range. *See, e.g., Vizcaino*, 290 F.3d at 1051 (approving multiplier of 3.65).

The Court recognizes that class counsel assumed substantial risks and burdens in representing Plaintiffs in this action. Numerous "Pick-a-Payment" class actions and single-plaintiff actions have been rolled into the original case for coordinated pretrial proceedings. The case has been vigorously contested: extensive discovery has been conducted, several motions have been heard, and several more have been briefed. Class counsel have committed to render continuing aid to class members who are attempting to obtain loan modifications. In the Court's opinion, class counsel comported themselves in a capable and professional manner throughout the case, and they obtained an excellent result for the class. Accordingly, the Court has no hesitation in awarding attorneys' fees and costs in the amount of $25 million.

## VI. ORDER

(1) The motion for final approval of the class action settlement is GRANTED;

(2) The objections to the settlement are OVERRULED;

(3) Marcella Rose's motion to intervene is DENIED;

(4) The proposed service payments to class representatives are APPROVED; and

(5) The motion for attorneys' fees and costs in the amount of $25 million is GRANTED.

DATED: 5/17/2011

JEREMY FOGEL
United States District Judge